USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/20/18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X
                                                                    :
SHANNAH LAUMEISTER STERN, as Trustee of the                         :
Bert Stern 2010 Trust and Marital Trust and BERT                    :
STERN PRODUCTIONS LLC,                                              :
                                                                    :          16 Civ. 9886 (PAE)
                                          Plaintiffs,               :
                                                                    :          OPINION & ORDER
                  -v-                                               :
                                                                    :
LISA LAVENDER and LYNETTE LAVENDER,                                 :
                                                                    :
                                          Defendants.               :
                                                                    :
------------------------------------------------------------------ X

PAUL A. ENGELMAYER, District Judge:

Two months before she died in August 1962, Marilyn Monroe posed at the Bel-Air Hotel in Los Angeles for a series of photographs—known as the "Last Sitting"—taken by the famed photographer Bert Stern. Soon after Monroe's death, some of those photographs were published in *Vogue* magazine. They became iconic.

This case centers on claims that defendants Lisa and Lynette Lavender ("the Lavenders") infringed copyright with respect to various Last Sitting photographs. Stern's widow, Shannah Laumeister Stern (as trustee of Stern's testamentary trust), and Stern's production company, Bert Stern Productions LLC ("BSP", and collectively, "plaintiffs"), bring claims against the Lavenders, former longtime assistants to Stern. They claim that the Lavenders, without a license to do so, took a number of actions constituting copyright infringement. These mostly involved the reproduction, offer, and sale (on sites including eBay and Amazon) of modified versions of certain of these photographs.

The parties have now cross-moved for summary judgment, in whole or part. The motions implicate two broad questions. First, and most consequential, was Bert Stern—and today are the

1

successors to his rights—the rightful owners of the copyright interests in these photographs? The Lavenders claim that Stern never had such rights. They claim that the photographs of Monroe taken by Stern were in fact "works for hire" whose copyright belongs to Condé Nast, publisher of *Vogue*, which helped arrange Stern's photo shoots with Monroe. Therefore, they claim, Stern's heirs cannot maintain this action. Second, assuming that Stern was the rightful copyright owner, did Stern gift certain photographs to the Lavenders, and did he authorize the Lavenders to make, modify, and sell, following his death, copies of the Monroe photographs? The Lavenders claim that Stern did so shortly before he died. Plaintiffs dispute this.

In the decision that follows, the Court resolves the first of these two broad issues, relating to ownership of copyright in the Last Sitting photographs. For the reasons set forth below, the Court finds that Stern was—and that his successors in interest are—the rightful owner(s) of the copyright to the photographs. As to this issue, the Lavenders have not adduced evidence sufficient to create a genuine dispute of material fact.

As to the claims that the Lavenders have infringed plaintiffs' copyright through various actions since Stern's death, however, material disputes of fact preclude summary judgment on most of these claims, as well as plaintiffs' non-copyright claims brought under the Lanham Act and state law. The disputed fact issues centrally include whether Stern, before his death, gave gifts to the Lavenders of certain Last Sitting photographs, either in original or modified form, and/or whether he authorized them, after his death, to make and sell reproductions of those works, including in "poster" form. The disputed fact issues also include whether Stern authorized the Lavenders to, after his death, sign his name to certificates of authenticity issued along with photographs that they sold.

The Court does, however, resolve two narrower issues.

First, the Court holds, with the Lavenders, that—assuming *arguendo* that the Lavenders were found to be the outright owners of certain photographs per gifts from Stern—it was fair use for the Lavenders, in the course of selling such work on Internet sites such as eBay, to display online an image of the object offered for sale. This holding does not, however, dispose of any claim brought, because the Lavenders' ownership of Stern's photographs is disputed.

Second, the Court grants summary judgment to plaintiffs on the Lavenders' one surviving counterclaim, which alleged a violation of the Digital Millennium Copyright Act (DMCA), 17 U.S.C. § 512(f), in connection with "take-down" notices that plaintiffs sent to eBay in an attempt to block sales of original and modified Stern prints.

The case will proceed now to trial, within the parameters set by these rulings.

## I.    Facts[1]

### A.    Stern and "The Last Sitting"

---

[1] This Court draws its account of the facts of this case from the parties' submissions in support of and in opposition to the motions for summary judgment, including: the parties' joint statement of stipulated facts, Dkt. 67 ("JSF"); plaintiffs' Local Rule 56.1 statement, Dkt. 76 ("Pl. 56.1"); defendants' Local Rule 56.1 statement, Dkt. 82 ("Def. 56.1"); plaintiffs' counter-statement to defendants' Local Rule 56.1 statement, Dkt. 96 ("Pl. 56. 1 Response"); the declarations of Helene M. Freeman in support of plaintiffs' motion for summary judgment, Dkt. 73 ("Freeman Decl.") and Dkt. 90 ("Second Freeman Decl."); the declarations of Shannah Laumeister Stern Dkt. 75 ("First Stern Decl.) and Dkt. 95 ("Second Stern Decl."); the declaration of Lisa Lavender, Dkt. 80 ("Lavender Decl."); the declaration of Ellen Boughn, Dkt. 74 ("Boughn Decl."); and the declarations of Niall MacGiollabhui, Dkt. 79 ("MacGiollabhui Decl."), and Dkt. 101.

Citations to a party's Rule 56.1 Statement incorporate by reference the documents cited therein. Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, the Court finds such facts true. See S.D.N.Y Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph required to be served by the opposing party."); *id*. at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

In June 1962, Bert Stern, a celebrated commercial and fine-art photographer known for his photographs of celebrities of his era, including Sophia Loren, Audrey Hepburn, and Elizabeth Taylor, JSF ¶ 1, photographed Marilyn Monroe at the Bel-Air Hotel in Los Angeles.  *Id.* ¶ 2. Taken over three sittings, Stern's 2,571 photographs of Monroe are known collectively as the Last Sitting.  JSF ¶¶ 11, 15.  Stern later wrote at length about the sittings themselves and the events leading up to them, including his memorable interactions with Monroe, in *The Last Sitting*, a 188-page book published in 1982 and excerpted at length in a contemporaneous *Vogue* magazine article.  *See* JSF ¶¶ 12, 14; *id.* Ex. 3 ("1982 *Vogue* Article").  Later in this decision, the Court recaps Stern's account of the events leading to the sittings, because that account is central to the Lavenders' claim here that Stern's photographs were works for hire whose copyright belongs to Condé Nast, which had arranged aspects of the sittings with the intent of publishing some of Stern's photographs in *Vogue*, of which it was publisher.

On August 5, 1962, shortly after the photographs were taken, Monroe died.

On September 1, 1962, *Vogue* published six of the photographs.  JSF ¶ 11.

On October 28, 1980, Stern entered into an agreement with William Morrow and Company, Inc. ("Morrow") to publish a subset of the Last Sitting photographs in book form.  *See* Def. 56.1 ¶ 14; Freeman Decl. Ex. 2C (the "1980 Agreement").  In that agreement, Stern represented that he was "the sole author and proprietor of the work"—*i.e.*, the photographs to be published in the book—and that the work would not "infringe upon any copyright or proprietary right of any third party."  1980 Agreement at 1.  Stern assigned to Morrow substantially all of his rights to publish and sell the book.  *Id*.  On September 23, 1982, Morrow published *The Last Sitting* ("*The Last Sitting*"), which contained more than 100 of Stern's June 1962 photographs of

Monroe.  JSF ¶ 12.  As detailed below, on November 15, 1982, *The Last Sitting* was registered for copyright, with Stern identified as the owner of the photographs within it.  *Id.* ¶ 13.

On June 8, 1982, shortly before Morrow published *The Last Sitting*, *Vogue* purchased, pursuant to a written agreement, pre-publication rights to print selected photographs from the book.  Def. 56.1 ¶ 15; *see* Freeman Decl. Ex. 2A (the "1982 Agreement").  In that agreement, *Vogue* and Stern agreed that the magazine was "acquiring exclusive North American serial rights to the text" of *The Last Sitting* book, "along with the exclusive right to print selected photographs from the book or from Stern's Marilyn collection in their September 1982 issue." 1982 Agreement ¶ 1.  *Vogue* also agreed to publish "[a]ppropriate copyright acknowledgement" in conjunction with the text and photographs, which included, on the first page of the article to be published, the following acknowledgement:

> Copyright ©1982 by Bert Stern from the book THE LAST SITTING by Bert Stern, text with Annie Gottlieb, to be published by William Morrow & Company in October.

*Id.* ¶ 2.  *Vogue* and Stern further agreed that "all material provided [to] Vogue Magazine for reproduction purposes is the exclusive property of Bert Stern and shall be returned to him as soon as possible."  *Id.* ¶ 4.  Pursuant to the agreement, *Vogue* published photographs from the book, along with text excerpted from it, in its September 1982 issue.  JSF ¶ 14; *see* 1982 *Vogue* Article.  The article included the agreed-upon copyright acknowledgment.  *See* 1982 *Vogue* Article at 3.

On September 26, 1989, by letter from a William Morrow & Company executive, Morrow agreed to "revert[]" to Stern "all publication rights" that Stern had granted to Morrow in the 1980 Agreement (subject to a limited exception).  *See* Freeman Decl., Ex. 2B; Def. 56.1 ¶ 18.

In June 1992, Stern entered into an agreement with Schirmer/Mosel Verlag GmbH ("Schirmer"), a Munich-based German publisher, to publish a second book of photographs from the Last Sitting. First Stern Decl. Ex. 1; *see* Def. 56.1 ¶ 19. That book, *Marilyn Monroe: The Complete Last Sitting*, was published in the United Kingdom on July 1, 1992 by Schirmer Art Books, Schirmer's English subsidiary. First Stern Decl. ¶ 4; *see* Def. 56.1 ¶ 19. It contains reproductions of all 2,571 Last Sitting photographs. Schirmer did not register this book for copyright in the United States. First Stern Decl. ¶ 5.

In ensuing years, Stern exhibited and sold prints of the Last Sitting works, including through the Staley-Wise Gallery in New York City and the Vered Gallery in East Hampton, New York. First Stern Decl. ¶ 7; *see* Def. 56.1 ¶ 21. Stern (and/or BSP) also licensed the reproduction of Last Sitting images for use in books, films, and magazines. These licensees included Condé Nast magazines such as *Vanity Fair. See* First Stern Decl. ¶ 9; *id.* Exs. 2, 3; Def. 56.1 ¶¶ 22–23. Condé Nast did not, at any point, register any of the Last Sitting photographs for copyright or otherwise publicly assert a copyright interest in any of them.

In 1997, Stern brought a lawsuit against Condé Nast. He alleged copyright infringement based on a publication by Condé Nast's *Allure* magazine of a single Last Sitting photograph. Def. 56.1 ¶ 42; *see* Pl. 56.1 Response ¶ 42. Condé Nast defended on the ground that it had obtained a license to use the photo from a third party licensee, Globe Photos. *See* MacGiollabhui Decl. Ex. D. Stern later voluntarily dismissed the lawsuit in exchange for a modest sum from Globe Photos. *See id.* at CN004. Salient here, the lawsuit led to an exchange of letters between the parties' outside counsel. After the discontinuance, in an April 21, 1998 letter, Condé Nast's counsel wrote Stern's counsel. Pl. 56.1 Response ¶ 43; *see* MacGiollabhui Decl. Ex. F. Noting that Stern had asserted ownership of copyright interests in the Last Sitting photographs pursuant

to an agreement with Condé Nast and had referenced such an agreement in the book *The Last Sitting*, Condé Nast's counsel stated that Condé Nast did not possess such a contract. *See* MacGiollabhui Decl. Ex. F. Counsel stated that, had there been no such contract, it was possible that Condé Nast was the copyright owner, depending on how the "work for hire" doctrine under the 1909 Copyright Act in effect in 1962 applied. *Id.* The letter invited Stern's counsel to explore the issue with Condé Nast, including by providing a copy of such a contract. *Id.* In an April 28, 1998 letter, Stern's counsel responded that Stern did not possess such a contract. *See* MacGiollabhui Decl. Ex. G. But, Stern's counsel wrote, the "photographs [Stern] made of Marilyn Monroe during that year was a self assignment and he is the owner of these images." *Id.* The record does not disclose any further exchanges between Stern and Condé Nast as to copyright ownership of the Last Sitting photographs, or any change in their course of dealings.

On June 26, 2013, Stern died. JSF ¶ 3. Stern's assets, including his copyright interests, passed to the Bert Stern 2010 Trust (the "Trust"), which his widow, Shannah Laumeister Stern ("Laumeister Stern"), serves as trustee. *See* JSF ¶¶ 4–5; Def. 56.1 ¶ 5. The Bert Stern 2010 Trust is also the sole member of Bert Stern Productions LLC, a New York limited liability company organized in 2016 as the successor, by merger, to BSP. JSF ¶ 7. Laumeister Stern is the chief executive officer of BSP. *Id.* ¶ 7. The parties dispute whether, during Stern's lifetime, Stern or BSP owned the Last Sitting prints created by Stern. *See* Def. 56.1 ¶ 7. Although not germane to the issues litigated on summary judgment, this dispute may bear on the Lavenders' factual claim to have been given valid authority, following Stern's death, to make various uses of these photographs.

### B.      The Lavenders

Lisa and Lynette Lavender, both Manhattan residents, are identical twin sisters who worked as assistants to Stern.  They assisted Stern with, among other things, the sale of prints of his images, arranging for exhibitions or sales of his images, and facilitating responses to interview requests.  JSF ¶¶ 9, 16.[2]  Beginning in 2002, as part of their authorized work for Stern, Lisa Lavender sold prints of Stern's photographs on eBay and elsewhere.  *See* Pl. Response 56.1 ¶ 48.

Beginning in 2010, the Lavenders, with Stern's approval, created "jeweled" prints of some Last Sitting photographs.  *See* Def. 56.1 ¶¶ 27–28; Lavender Decl. ¶ 5.  The parties refer to the jeweled prints as "Modified Prints."  The jeweling process involved gluing three-dimensional objects onto the prints, so that the objects in the original image are reflected.[3]  According to Lynette Lavender, Stern was involved in the process of "jeweling" the prints; she testified that she undertook the jeweling project in Stern's house, "because it was so huge, and they had to be on the floor."  Lynette Lavender Dep. at 54.  Jeweled prints were then sold.  An April 2012 agreement, for example, reflects a consignment from BSP to a Connecticut couple to sell the jeweled prints in connection with Stern's June–August 2012 show, "Evening With Marilyn."  It provided that Stern would receive 50 percent of the profit from the sales of the jeweled prints, that the couple would receive the other 50 percent, and that, out of Stern's profits, "Lisa and

---

[2] Lisa Lavender testified: "I did everything for Bert.  I took care of his assisting.  I took care of his book deals, his interviews, his photos.  I arranged the sales of his photos.  I took care of the shipping and the handling, and I took care of the business transactions for him."  Freeman Decl. Ex. 3 ("Lisa Lavender Dep.") at 8.

[3] Describing the jeweling process, Lynette Lavender testified: "I've done them in red, I've done them in pink, I've done them in clear . . . depending on how [Stern] was going to print the paper for me."  Second Freeman Decl. Ex. 5 ("Lynette Lavender Dep.") at 258.

Lynette Lavender will receive an agreed-upon percentage to be determined by Bert Stern."
Second Freeman Decl., Ex. N.

Before Stern's death, the Lavenders sold, on eBay, prints of Stern's photos, in both jeweled and unmodified form. *See* JSF ¶ 16. It is undisputed that, during his lifetime, Stern was aware of these sales, *see* Pl. Response 56.1 ¶ 48,[4] and plaintiffs do not bring claims as to them.

After Stern's death, the Lavenders continued to sell and offer for sale, on the Internet, prints by Stern, again, in both jeweled form and unmodified, including on eBay. JSF ¶¶ 16–17; *see* Am. Compl., Exs. A & B. In addition, in June 2015, Lisa Lavender entered into an agreement with OnGallery Ltd., a British company, licensing it to reproduce and sell two-dimensional reproductions of nine three-dimensional Modified Prints. JSF ¶ 24 & Ex. 10. The agreement referred to Lisa Lavender as "the Artist"; she represented that she "holds the model release documentation for certain third party interests implicated by the work." *Id.* Ex. 10. The two-dimensional reproductions, referred to as "posters" by the parties, *see id.* ¶ 25, were then sold by OnGallery through Amazon.com, *id.* ¶ 27. Under the agreement with OnGallery, the Lavenders were to receive 40 percent of the proceeds of the sales of these posters. *See id.* ¶ 24; *id.* Ex. 10. The agreement did not provide for any proceeds to be paid to Stern's estate or BSP. *Id.* In 2016, the Lavenders received $3,624.13 from OnGallery's sales. *Id.* ¶ 26.

A central disputed issue of fact is whether Stern gave rights, effective after his death, to the Lavenders with respect to the Last Sitting prints. Lisa Lavender attested that she and Lynette own both unmodified prints and Modified Prints, as the result of gifts made during Stern's lifetime. Lavender Decl. ¶ 3. She further attested that, under an agreement she claims to have

---

[4] The Lavenders attest that Stern did not object to his prints being sold on eBay, but wanted to be careful not to "hurt his reputation" or "his integrity." Lynette Lavender Dep. at 43.

had with Stern, the Lavenders "own all modified prints in [their] possession, along with the modified prints that were in [Stern's] house in Sag Harbor at the time of his death." *Id.* ¶ 5. She further attested that Stern orally gave her permission to sell his prints and modified prints. *Id.* ¶ 4. In addition, the Lavenders have come forward with a typed writing dated June 16, 2013—10 days before Stern's death—that bears the apparent signatures of both Stern and Lisa Lavender. It reads: "I Bert Stern, from this date on, allow my personal assistant, Lisa Lavender, in the guidance of my best interests, to sign my photos for me, for I am not capable. She is allowed to sale my photos and pay Bert Stern Productions." *See* Second Freeman Decl., Ex. J.[5] The parties dispute the validity, import, and meaning of this writing, and its posthumous effect, if any. More broadly, plaintiffs dispute that the Lavenders own any of the prints in question or were given any of the rights they claim.

### C. Copyright Registrations for the "Last Sitting" Photographs

At different times, both Stern and the Lavenders have sought to register copyright claims for Last Sitting photographs or works derived from them. JSF ¶¶ 12–15, 21–23. On the basis of the summary judgment record, it does not appear that any other person or entity—including Condé Nast—has ever registered copyright claims as to any Last Sitting photograph.

#### 1. Stern

Although the Last Sitting photographs were all created in 1962, and a subset of six photographs was first published then, the first registration of copyright for any Last Sitting photograph was made in 1982. Specifically, on November 15, 1982, less than two months after

---

[5] In addition, along with their reply brief on summary judgment, the Lavenders came forward—apparently for the first time in this litigation—with three other documents that they claim also evince grants of authority from Stern with respect to Last Sitting photographs or derivatives. *See* Dkt. 101, Ex. C.

*The Last Sitting* book was published, the book, containing more than 100 of the Last Sitting photographs—was registered for copyright in the United States, receiving United States copyright registration certificate TX 1-024-270.  JSF ¶ 13; *see also* JSF Ex. 2.  The copyright registration listed Annie Gottlieb as the author of the book's text and Stern as the copyright claimant for the balance of the book, including the photographs within.  JSF ¶ 13; *see* Def. 56.1 ¶ 17.  In the form submitted for the book's copyright registration, the box indicating whether the work was a "work for hire" was checked "No."  *See* Pl. 56. 1 Response ¶ 40.

In 1992, as noted, Schirner did not register *Marilyn Monroe: The Complete Last Sitting*, for copyright in the United States.  *See* First Stern Decl. ¶ 5.  However, on November 26, 2013, Stern's estate registered for copyright all 2,571 photographs taken by Stern during the Last Sitting as published in that book.  JSF ¶ 15; *id.* Ex. 4 ("Complete Last Sitting Copyright Registration").  It received copyright registration certificate number VA-1-923-509.[6]

### 2.  The Lavenders

On March 30, 2017, the Lavenders were issued certificate of copyright registration VAu-1-267-517 for the "3-D artwork added to pre-existing Stern Photographs with an effective date of March 1, 2017."  JSF ¶ 21; *see also id.* Ex. 7.  The copyright registration distinguished between the "new material included in [the] claim" (*i.e.*, the jewels and color added to the photographs) and the preexisting material that was excluded from the copyright claim (*i.e.*, the photographs themselves).  JSF Ex. 7.  Although the Lavenders had applied for copyright protection for 71 Modified Prints, the Copyright Office explained that the copyright registration extended only to the copyrightable works within that group and that "most [of the works] are not copyrightable."

---

[6] These photographs were registered for copyright "as published in the United Kingdom on July 1, 1992, in the 463-page book entitled '*Marilyn Monroe: The Complete Last Sitting*' by Schirmer Art Books."  JSF ¶ 15.

JSF Ex. 8 at 1; *see* JSF ¶ 23.  Because the Lavenders represented in their copyright registration that the works were "used in art gallery shows" and thus, "unpublished," the copyright examiner registered the works as such.  JSF Ex. 8 at 2.

**D.    Correspondence With Condé Nast Following Stern's Death Relating to Copyright Ownership**

In 2014, a representative for Stern's estate contacted Condé Nast regarding Stern's rights to Last Sitting photographs.  Boughn Decl., Ex. 2.  Condé Nast's representative wrote back, by email:

> As Bert Stern himself was aware, Condé Nast owns the copyright to works commissioned by Condé Nast magazines pursuant to contracts with Mr. Stern and the copyright law in effect at the time.  (Rights to the Marilyn Monroe "Last Sitting" images were granted back to Mr. Stern subsequent to publication of those images.)  Moving forward, as in the past, Condé Nast will not pay royalties to the Bert Stern Estate on revenues generated through the licensing and/or reproduction print sales of Condé Nast's copyrighted works.  Additionally, any requests for licensing of the copyrighted material should be returned to Condé Nast.

*Id.*

On December 21, 2017, during discovery in this litigation, a representative of Condé Nast responded by email to an inquiry from the Lavenders' counsel.  *See* MacGiollabhui Decl., Exs. H & I.  The Lavenders' counsel inquired whether Condé Nast possessed any document reflecting a transfer to Stern of copyright interests in the Last Sitting photographs, and what Condé Nast's current position was as to the ownership of these interests.  *Id.* Ex. H.  In response, Condé Nast's outside counsel wrote that after a "thorough review" of its files—and after speaking with employees, none of whom had any firsthand knowledge of the creation of the photographs or any transfer of rights to them—Condé Nast had not found any evidence of a writing bearing on the ownership or transfer of rights to the Last Sitting photographs.  *Id.* Ex. I.  Condé Nast's counsel wrote that its records indicated that the photographs had been taken on commission, supporting

the argument that, "under the applicable copyright law" in 1962, "Condé Nast would be deemed to be the owners of the copyright therein." *Id.* However, counsel wrote: "I can also confirm that on numerous occasions since the photographs were taken in 1962, Condé Nast has made the affirmative decision not to interfere with Mr. Stern's use and exploitation of the photographs, even though such use and exploitation ran contrary to Condé Nast's rights." *Id.*

## II. Procedural History

On December 22, 2016, plaintiffs filed an initial Complaint, bringing various claims of copyright infringement against the Lavenders. Dkt. 1. On June 30, 2016, plaintiffs filed an Amended Complaint. Dkt. 44 ("Am. Compl.").

The Amended Complaint's principal claim is that, in violation of plaintiffs' copyrights, the Lavenders offered for sale on eBay, under various pseudonyms, copies of images from the Last Sitting, and images modified by the Lavenders. Am. Compl. ¶¶ 15–16, 21. It further alleges that the Lavenders offered for sale reproductions of the Modified Images through OnGallery. *Id.* ¶¶ 17–20.

The Amended Complaint brings three claims for copyright infringement, one claim for violation of the Lanham Act, 15 U.S.C. § 1125, and one claim for deprivation of property under New York law, and pursues damages and injunctive relief. *Id.* Although the boundaries between these claims are not sharply delineated by the Amended Complaint or clarified by the briefs on summary judgment, as pled:

- Count One alleges copyright infringement by making unauthorized copies of the Last Sitting images; displaying the images on Amazon.com, Pinterest.com, and eBay.com; and publicly displaying modified copies of the images and offering for sale and selling modified copies. Am. Compl. ¶¶ 25–32.

- Count Two alleges copyright infringement by modifying copies of the images and publicly displaying, offering for sale, and selling, those modified copies. *Id.* ¶¶ 33–35.

- Count Three alleges causing or materially contributing to copyright infringement by the other defendants. *Id.* ¶¶ 36–39.

- Count Four alleges false and misleading representations in connection with the sale of Last Sitting images in violation of the Lanham Act, 15 U.S.C. § 1125, including by representing that the images bear Stern's original signature, that they are accompanied by a genuine certificate of authenticity, and that the Lavenders were authorized to sell the works. It alleges that these misrepresentations were likely to cause confusion or mistake as to the origin, sponsorship, or approval of the sales. *Id.* ¶¶ 40–44.

- Count Five alleges deprivation of property under New York law, in that the Lavenders were given electronic copies and signed prints of Stern's works as part of their work for BSP, that these prints or electronic copies belong to plaintiffs, and that to the extent the Lavenders' sales of Last Sitting works were of prints belonging to plaintiffs, profits from those sales belong to the plaintiffs. *Id.* ¶¶ 45–50.

On July 15, 2017, the Lavenders responded to the Amended Complaint and filed a counterclaim against BSP, claiming copyright infringement by BSP of the Lavenders' works. Dkt. 45 ("Answer") ¶¶ 14–16.[7] The Lavenders alleged that they are the legal owners of all rights to the jeweled "Last Sitting" prints and of the copyrights in those works. *Id.* ¶ 13. They asserted three claims of copyright infringement. *Id*. ¶¶ 14–29. On March 6, 2018, however, the Lavenders voluntarily dismissed their first and third counterclaims with prejudice. Dkt. 71. Their remaining counterclaim alleges that plaintiffs misrepresented to eBay, in the course of sending "takedown notices" to eBay with respect to the Lavenders' attempted sales of Modified Prints, that the Lavenders were infringing their copyrights. Answer ¶¶ 20–26.

On March 9, 2018, plaintiffs moved for partial summary judgment and to dismiss the Lavenders' second counterclaim, Dkt. 72, and filed a 56.1 statement, Dkt. 76, a series of declarations, Dkts. 73–75, 77, and a memorandum in law in support, Dkt. 78.

_____

[7] The Answer repeats paragraph numbers for its answer paragraphs and its counterclaim paragraphs. The Court's paragraph citations are to the counterclaim paragraphs.

On April 6, 2018, the Lavenders cross-moved for summary judgment, Dkt. 81, and filed declarations from counsel and Lisa Lavender, Dkts. 79–80, and a memorandum of law in support, Dkt. 83.

On May 4, 2018, plaintiffs filed their response papers, including another series of declarations, *see* Dkts. 90–95, a responsive 56.1 statement, Dkt. 97, and a memorandum of law in reply and in opposition, Dkt. 96; *see also* Dkt. 100 (amended reply brief).

On May 18, 2018, the Lavenders filed their reply brief, Dkt. 102; *see* Dkt. 103 (amended reply brief), and another declaration from counsel, Dkt. 101.

On July 11, 2018, the Court directed counsel to supplement the record with a copy of *The Last Sitting*. *See* Dkt. 105.

## III.    Applicable Legal Standards for a Motion for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.,* 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quotation marks and citation omitted). Rather, the opposing party must establish a genuine issue of fact by

"citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also*
*Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing
law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242,
248 (1986). In determining whether there are genuine issues of material fact, the Court is
"required to resolve all ambiguities and draw all permissible factual inferences in favor of the
party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d
Cir. 2012) (citing *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)) (quotation marks
omitted).

"A court faced with cross-motions for summary judgment need not grant judgment as a
matter of law for one side or the other, but must evaluate each party's motion on its own merits,
taking care in each instance to draw all reasonable inferences against the party whose motion is
under consideration." *Cariou v. Prince*, 784 F. Supp. 2d 337, 345 (S.D.N.Y. 2011) (quoting
*Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)) (quotation marks omitted).
"[S]ummary judgment will not lie if the . . . evidence is such that a reasonable jury could return a
verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

## IV. Discussion

The parties have cross-moved on the issue, relevant to all claims of infringement,
whether Stern held—and thus whether plaintiffs, as his successors in interest, hold—the
copyright to the Last Sitting works. The summary judgment motions also implicate two other
discrete questions relating to plaintiffs' claims of infringement with respect to the Lavenders'
display or sale of Last Sitting prints, both in original and modified (jeweled) form. Finally,
plaintiffs move for summary judgment on the Lavenders' counterclaim challenging plaintiffs'

takedown notices to eBay, and the Lavenders move for summary judgment on plaintiffs' state-law claim for return of property. The Court takes up these questions in turn.

**A. Ownership of Copyright for the Last Sitting Photographs**

The parties dispute whether Stern[8] owned the copyright interests in the Last Sitting photographs. As reviewed above, in 1982, Stern registered more than 100 of these photographs for copyright, and in 2013, his estate registered all 2,571 photographs. The Lavenders argue, however, that in fact Condé Nast—although it contractually acknowledged Stern's ownership, never pursued a claim to such ownership, and over the years repeatedly acquired licenses from Stern to publish works—was and is the owner of the copyrights to these works, on a "work for hire" theory.[9] On this premise, the Lavenders argue that any claim that they have infringed copyright can be pursued by Condé Nast only. The Court first sets out the law governing this dispute over ownership and then applies this law.

**1. Applicable Legal Principles Governing Copyright Ownership**

To establish a copyright infringement claim, a plaintiff must show "both ownership of a copyright and unauthorized copying by the defendant." *Hamil Am. Inc. v. GFI*, 193 F.3d 92, 98 (2d Cir. 1999).

Copyright law in the United States changed markedly with the passage of the Copyright Act of 1976 (the "1976 Act"), which superseded the Copyright Act of 1909 (the "1909 Act"). For disputes as to ownership of copyright, a court applies the 1909 Act to works created and actions taken before 1978 (the effective date of the 1976 Act) and the 1976 Act to works created

---

[8] For purposes of this discussion, the Court refers to Stern and BSP collectively as "Stern."

[9] The Lavenders have standing to invoke the work-for-hire doctrine notwithstanding being third parties to the arrangement between Stern and Condé Nast that is the basis for their work for hire claim. *See Urbont v. Sony Music Entm't*, 831 F.3d 80, 87–88 (2d Cir. 2016).

and actions taken after 1978. *See, e.g., Int'l Film Exch., Ltd. v. Corinth Films, Inc.*, 621 F. Supp. 631, 633 (S.D.N.Y. 1985). Because events relevant to the ownership of the Last Sitting photographs occurred both before and after 1976—the creation of the photographs was in 1962 but their publication was in 1962, 1982, and 1992, and their registration in 1982 and 2013— addressing the ownership issues presented requires the Court to apply law drawn from both of these legal regimes.

### a. Copyright Ownership Under the 1909 Act

Before 1976, a dual system of copyright existed: Unpublished works were protected under each state's common law, whereas published works had federal statutory protection under the 1909 Act. *See Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc.*, 380 F.3d 624, 632–33 (2d Cir. 2004).[10] Under the 1909 Act, copyright ownership initially vested in the creator or author of a work. *Jim Henson Prods., Inc. v. John T. Brady & Assocs., Inc.*, 16 F. Supp. 2d 259, 284 (S.D.N.Y. 1997). The initial creator or owner of an unpublished work was protected under common law. *See* 17 U.S.C. § 2 (repealed effective 1978). And, "unless the author ha[d] given up his or her rights under copyright in a clear and unequivocal manner, he or she retain[ed] these rights." *Jim Henson Prods., Inc.*, 16 F. Supp. 2d at 285.

The "work for hire" doctrine was an application of the requirement that, to own a copyright to a work, a person or entity be the creator or author of that work. Under the 1909 Act, "an 'employer' who hires another to create a copyrightable work is the 'author' of the work for purposes of the statute, absent an agreement to the contrary." *Urbont v. Sony Music Entm't*, 831

---

[10] "The 1909 Act provided authors an initial 28–year term of protection, calculated from the date of publication, which could be renewed for an additional 28 years." *Shoptalk, Ltd. v. Concorde-New Horizons Corp.*, 168 F.3d 586, 590 (2d Cir. 1999).

F.3d 80, 85–86 (2d Cir. 2016) (quoting *Playboy Enters., Inc. v. Dumas*, 53 F.3d 549, 554 (2d Cir. 1995) (internal quotation marks omitted)).  "Thus, with respect to works for hire, the employer is legally regarded as the 'author,' as distinguished from the creator of the work, whom Learned Hand referred to as 'the "author" in the colloquial sense.'"  *Martha Graham Sch.*, 380 F.3d at 634 (quoting *Shapiro, Bernstein & Co. v. Bryan,* 123 F.2d 697, 699 (2d Cir. 1941)).

Under the 1909 Act, courts, to determine whether a work is indeed a "work for hire," apply an "instance and expense" test.  *Urbont*, 831 F.3d at 89; *see Martha Graham Sch.*, 380 F.3d at 636 ("[U]nder both the 1909 and 1976 Acts, a person's status as an employee renders a work created within the scope of employment as a work for hire, as to which the copyright belongs to the employer (in the absence of a contract providing otherwise).").  Formally, because the 1909 Act terms "employers" "authors," a court's inquiry is into whether the creator and the person who hired the creator had an employee-employer relationship.  *See Urbont*, 831 F.3d at 89; *Martha Graham Sch.*, 380 F.3d at 636.  But, because the "instance and expense" test is used to determine "employer" status, an artist qualifies as an "employee" under the 1909 Act "if the work is made at the hiring party's 'instance and expense,'" *Playboy Enterprises*, 53 F.3d at 554, even if under employment law the artist might be treated as an independent contractor, *see id.* (holding that, where the work was made at the hiring party's "instance and expense," "an independent contractor is an employee" and that a hiring party is an "employer" under the 1909 Act).[11]

---

[11] It was not until the mid-1960s that case law applied the work for hire doctrine under the 1909 Act to independent contractors.  *See id.* ("Until the mid-1960's, federal courts applied the work-for-hire doctrine only to cases in which a traditional employer/employee relationship existed between the hiring party and the creator of the work").

As to the application of the instance and expense test, "[a] work is made at the hiring party's 'instance and expense' when the employer induces the creation of the work and has the right to direct and supervise the manner in which the work is carried out." *Martha Graham Sch.*, 380 F.3d at 635. The test examines the circumstances surrounding the production of the work. To determine "instance," the Court looks to the power to supervise the creation of the work, creative contributions from the parties, and the hiring party's right to direct and supervise the manner in which the work was carried out. *Urbont*, 831 F.3d at 89. To determine "expense," the Court examines the resources the hiring party invested and the risk that the hiring party bore in investing in the endeavor. *Id.* at 89–90. In general, the work is a "work for hire" and made at the party's "instance and expense" when the hiring party "induce[d] the creation of the work and ha[d] the right to direct and supervise the manner in which the work is carried out." *Id.* at 89.

**b.     Copyright Registration Under the 1976 Act**

Under the 1976 Act, applicable to the registrations in 1982 and 2013 at issue here, a certificate of registration from the United States Register of Copyrights within five years of first publication of a work "constitutes prima facie evidence of the valid ownership of a copyright, although that presumption of ownership may be rebutted." *Hamil Am.*, 193 F.3d at 98; *see* 17 U.S.C. § 410(c) (a "certificate of [copyright] registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright"); *Boisson v. Banian, Ltd*, 273 F.3d 262, 267 (2d Cir. 2001). Where there has been such registration, "the party challenging the validity of the copyright has the burden to prove the contrary." *Hamil Am.*, 193 F.3d at 98. "Generally speaking, the presumption of validity may be rebutted '[w]here other evidence in the record casts doubt on the question.'" *Fonar Corp. v. Domenick*, 105 F.3d 99, 104 (2d Cir. 1997) (quoting *Durham Indus., Inc. v. Tomy Corp.*, 630

F.2d 905, 908 (2d Cir. 1980)).  Otherwise, "a plaintiff in a copyright infringement suit bears the burden of proving ownership of the copyright."  *Urbont*, 831 F.3d at 88.

Where registration has been made more than five years after first publication of the work, the evidentiary weight to be accorded the certificate of a registration is within the discretion of the court.  17 U.S.C. § 410(c); *see, e.g.*, *Van Cleef & Arpels Logistics, S.A. v. Jewelry*, 547 F. Supp. 2d 356, 362 (S.D.N.Y.), *adhered to on reconsideration sub nom. Van Cleef & Arpels Logistics, S.A. v. Landau Jewelry*, 583 F. Supp. 2d 461 (S.D.N.Y. 2008) ("Although a copyright registration issued more than five years after the first publication of a work is not entitled to the statutory presumption of validity, a court may accord it such evidentiary weight as it sees fit.").

### 2.    Analysis

The Court's analysis begins with Stern's registrations of the copyright to the Last Sitting images.  For the reasons explained below, the Court holds that these registrations both give rise to a rebuttable presumption that Stern owned the copyright in the Last Sitting photographs.  With the burden shifted to the Lavenders to rebut the presumption of copyright ownership, the Court addresses the Lavenders' claim that Condé Nast, not Stern, is the rightful owner.  Once inadmissible evidence is stripped away, this claim is based solely on Stern's account in *The Last Sitting* of how he came to photograph Monroe.  The Court finds that this ancient and ultimately inconclusive narrative is insufficient to rebut the presumption of validity.  Independently, the Court, which serves as the finder of fact in this case,[12] finds that even if Stern's 1982 narrative could be read to support a work-for-hire theory, such an inference would be vastly outweighed by the strong circumstantial evidence that Stern owned the copyright to these works.  These include legally operative agreements, and a long and consistent course of dealing, between Stern

---

[12] The parties have waived their rights to a jury trial.  *See* Dkt. 53.

and Condé Nast.  Thus, in its role as trier of fact, the Court would reach the same conclusion.

Accordingly, the Court holds that there are no material disputes of fact on this point and that

Stern is the copyright holder of all of the Last Sitting images.

### a. The Copyright Registrations as Prima Facie Evidence of Ownership

As noted, Stern's estate is the registered copyright holder of all of the Last Sitting

images.  *See* Complete Last Sitting Copyright Registration.  In 1982, *The Last Sitting* book—

containing more than 100 of the Last Sitting photographs—was registered for copyright in the

United States.  JSF ¶ 13; *see also* JSF Ex. 2.  Stern was identified as the copyright claimant for

all but the text of the book, including all of the photographs.  JSF ¶ 13; *see* Def. 56.1 ¶ 17.  Later,

in 2013, Stern's estate registered for copyright all 2,571 photographs taken by Stern during the

Last Sitting as published in that book.  JSF ¶ 15; Complete Last Sitting Copyright Registration.

The 1982 registration was virtually contemporaneous with the 1982 publication of *The

Last Sitting*.  As such, it came well within five years of the first publication of the photographs

published in that book.[13]  Under 17 U.S.C. § 410(c), a "certificate of [copyright] registration

made before or within five years after first publication of the work shall constitute prima facie

evidence of the validity of the copyright."  Where there has been such registration, "the party

challenging the validity of the copyright has the burden to prove the contrary."  *Hamil Am.*, 193

F.3d at 98.  Thus, as to the works first published in 1982 and registered for copyright that same

---

[13] With this limited exception:  Of the more than 100 Last Sitting images published in the 1982 book, two were among the six that had been published in *Vogue*'s September 1962 issue.  JSF ¶ 12.  They therefore do not enjoy the automatic statutory presumption.  Nevertheless, for the reasons reviewed below, the Court, exercising its discretion pursuant to 17 U.S.C. § 410(c), finds that, as to *all* Last Sitting photographs, a common presumption of ownership is to be afforded.

year, the Lavenders bear the burden of proving that the copyright registration was invalid. *See, e.g., FameFlynet, Inc. v. Shoshanna Collection, LLC*, 282 F. Supp. 3d 618, 623 (S.D.N.Y. 2017).

The 2013 registration is of a different legal character. It came some 21 years after the 1992 publication of the Schirner-published *Marilyn Monroe*. The statutory presumption of ownership does not attach to this registration. Instead, "[t]he evidentiary weight to be accorded" to this registration is "within the discretion of the court." 17 U.S.C. § 410(c).

Exercising that discretion, the Court's determination is that, on the facts here, the 2013 copyright registration ought to be afforded weight commensurate with that of the 1982 registration. The two registrations relate to a common set of 2,571 photographs that were taken contemporaneously (over three June 1962 sittings) under common circumstances. The Court has been given no basis in facts or evidence on which to treat differently the two tranches of registered works.[14] The different registration dates instead appear to derive from the circumstance that only a subset of the 2,571 images were chosen for the 1982 *Last Sitting* book, the need to register which appears to have driven the 1982 registration of the photos within it. There is no legal significance to that circumstance.

Further, in the 31 years between 1982 and the 2013 registration of the remaining photographs from the Last Sitting, Stern's claim to ownership of copyright was unchallenged. Quite to the contrary, the entity, Condé Nast, whom the Lavenders posit was the rightful owner, repeatedly affirmed, in a contract and in its conduct obtaining licenses to the works from Stern, *Stern's* ownership. Insofar as the law treats the 1982 registration as shifting the burden of proof

---

[14] To be sure, there are modest differences in the circumstances under which the three 1962 sittings at the Bel-Air Hotel were arranged, which might affect at the margins a work for hire analysis. But the two groups of registered photographs appear to straddle the sittings. There is no claim, for example, that the photographs that appeared in the 1982 book, and thus were registered in 1982, were all taken at a single sitting.

to a party contesting ownership of the photographs then registered, it is sensible to treat in like manner the remainder of the Last Sitting photographs.

In its discretion under § 410(c), the Court therefore finds that a presumption of valid ownership on Stern's part applies to all the Last Sitting photographs, including those first registered in 2013. *See, e.g.*, *Yurman Design, Inc. v. Golden Treasure Imports, Inc*., 275 F. Supp. 2d 506, 516 (S.D.N.Y. 2003) (treating as *prima facie* evidence of copyright validity a registration made more than five years after first publication); *Brighton Collectibles, Inc. v. RK Texas Leather Mfg*., No. 10-CV-419-GPC WVG, 2012 WL 6553403, at *3 (S.D. Cal. Dec. 13, 2012) (treating as *prima facie* evidence of copyright validity a registration made more than 13 years after first publication); *Graphic Design Mktg., Inc. v. Xtreme Enterprises, Inc*., 772 F. Supp. 2d 1029, 1033 (E.D. Wis. 2011), adhered to, No. 11-C-0051, 2011 WL 534337 (E.D. Wis. Feb. 8, 2011) (treating as *prima facie* evidence of copyright validity a registration made 10 years after first publication); *see also Telerate Sys., Inc. v. Caro*, 689 F. Supp. 221, 227 (S.D.N.Y. 1988) (finding reliable a registration certificate made 15 years following date of first publication).

### b. The Lavenders' Proposed Rebuttal Evidence

The issue then is whether the Lavenders have come forward with sufficient evidence to rebut the presumption that Stern's registrations were valid. To this end, the Lavenders argue that the owner of the Last Sitting photographs was *Vogue* publisher Condé Nast, which "employed" Stern, making his photographs works for hire. In support, the Lavenders offer two sets of evidence: (1) Stern's 1982 account in *Vogue* (itself an excerpt from the 1982 *Last Sitting* book) of how the photographs came about; and (2) correspondence decades later among lawyers for Stern, Condé Nast, and the Lavenders commenting on the issue of ownership.

### i. Stern's 1982 book

### 1. Summary

Stern's first-person account in *The Last Sitting* of the circumstances under which the 1962 sittings with Monroe came about is, as relevant here, as follows:[15]

By 1962, Stern had become a "*Vogue* photographer." 1982 *Vogue* Article at 3. *Vogue* had, in Stern's words, "given me a contract[16] to shoot one hundred fashion pages a year. And on top of that, I got ten pages to do whatever I wanted with—and enough expense money to produce them." *The Last Sitting* at 17.

As to the impetus for the Last Sitting project, Stern writes that he was traveling to Rome for a different project when he had an idea: "A beautiful picture of Marilyn Monroe in *Vogue* . . . *that* was an idea that had a glow to it." *Id.* (ellipsis and emphasis in original). When Stern landed in Rome, he called his assistant in New York and said, "Vickie, call Marilyn Monroe's agent and see if she'll pose for me for *Vogue*." "Oh what a *great* idea!" his assistant replied. Stern said, "And check it out with *Vogue*. Go over to their library and see if they've ever run a picture of her. Okay?" *Id.* at 21. The next day, Stern's assistant Vickie called back. She said, "Good news boss . . . . Yes, yes, and no. Marilyn Monroe says yes, *Vogue* says yes, and no, they've never done her before." *Id.* at 22.

Back in New York, Stern came up with where to shoot Monroe (the Bel-Air Hotel in Los Angeles) and how: "purely Marilyn, nude." *Id.* at 25. Stern also devised the means by which he

---

[15] Although only the 1982 *Vogue* Article was submitted as part of the summary judgment record, the Court has found it useful to draw upon the more complete account in the 1982 Morrow book, *The Last Sitting*, from which the 1982 Article was excerpted, which the Court requested be made part of the record, *see* Dkt. 105, and which is properly considered.

[16] As noted above, the parties have not located any written contract between Stern and Condé Nast in effect in 1962.

would secure that desired shot: "Maybe the only way I was going to get it was through illusion: screens, veils. So I went to *Vogue* and said, 'Can you get me some scarves? Scarves you can see through—with geometrics. And jewelry." *Id.*

Stern photographed Monroe in three sessions that June, all at the Bel-Air Hotel. For the first session, Stern designed the set, the lighting, and even the music. And he—and Monroe— dictated the course that that shoot took. *Id.* at 26. "Monroe . . . posed for Stern in the nude or with nothing more than various sheer scarves, sheets, and costume jewelry." Def. 56.1 ¶ 12; *see* 1982 *Vogue* Article at 7.

Following this session, Stern returned to New York, where he developed the images and brought them to the editorial director of Condé Nast, Alex Liberman. *Last Sitting* at 73. Liberman instructed Stern that, while *Vogue* liked the photographs, it wanted to run a full eight-page spread, and wanted more black and white fashion photographs. *Id.* at 74–75. With this, *Vogue* arranged additional sessions for Stern to photograph Monroe. *Id.* at 79.

For this second shoot, *Vogue* contacted Monroe. *Id.* After she agreed, Stern arranged again for a suite at the Bel-Air—a three-room cottage, Number 96, on the Bel Air grounds. *Id.* at 80. *Vogue* sent Stern to Los Angeles with a hairdresser, Kenneth, and an editor, Babs Simpson. As Stern recounted, "The fact that *Vogue* was sending an editor on the shoot was a sign that they were getting serious. The first time they'd let me go off and do whatever I wanted, but now they had realized that I was on to something, and they were going to make sure they got what *they* wanted. Babs Simpson and I had worked together many times, and she understood me. I was sure they'd chosen her as the editor who could let me be the most creative and at the same time keep the most control." 1982 *Vogue* Article at 13; *Last Sitting* at 79. Simpson brought the clothing in which Monroe would pose. Stern made sure there was "plenty of Dom Perignon"

and a case of Chateau Lafite-Rothschild. *Id.* at 83. This second set of images has become known as the "fashion" images. Def. 56.1 ¶ 12.

As Stern recounts, these clothed poses were "going in the opposite direction from my original idea." *Last Sitting* at 83. "Vogue wanted to dress Marilyn up in beautiful clothes and I still thought the right thing to do was take her clothes off." *Id.* at 86. Later in that shoot, after Monroe and Stern were both drunk on champagne, *see id.* at 111, Monroe decided to pose in clothing *Vogue* had rejected, *id.* at 112, 117–18. Stern then directed *Vogue*'s Simpson to leave the room. *Id.* at 118. As Stern recounts, "We were alone. There was no one to tell us to shoot another dress or straighten another hair. This was just for us." Monroe asked Stern, "What do you want to do?" *Id.* Stern then photographed Monroe in bed, wrapped in a sheet. *Id.* at 118–36.

Two days later, Monroe returned to the Bel-Air Hotel for the third sitting. *Id.* at 150. That day, Stern remembered that he had not yet taken an image he had set out to take: "that one black and white that was going to last forever, like Steichen's Garbo." *Id.* Stern then directed his assistant, Simpson, and Kenneth to make that shot possible. *Id.* at 153. Stern took the photo from above. As he recounted, "I saw what I wanted, I pressed the button, and she was mine." *Id.* at 158.

Stern returned to New York, where he supervised his studio assistant, Gar, in developing the images. *Id.* at 173. "Gar knew how to make prints the way I liked them, and I had built him the best darkroom setup money could buy." *Id.* While working in the darkroom, Stern received a call from a *Vogue* representative, informing him that Monroe had final approval of all of the photographs. *Id.* Stern then selected 30 of his favorite works, including "one picture I really cared about": the headshot. *Id.* at 174. A few weeks later, Stern saw the images *Vogue* had

selected for publication. "[T]here was something haunting about the pictures they had chosen. All those black dresses, dark clothing, dark background . . . the layouts had an elegiac quality. It was strange and eerie. Because Marilyn was still alive." *Id.* at 184 (emphasis omitted) (ellipsis in original).

## 2. Assessment

All parties agree that Stern's narrative from *The Last Sitting* would be admissible at trial if offered by the Lavenders. *See* Fed. R. Evid. 801(d)(2) (party-opponent statement admissible for truth of matter asserted). That, however, is the entirety of the evidence that the Lavenders propose to offer as to the circumstances surrounding the Last Sitting. The Lavenders have not identified any surviving witnesses to these events; they have not identified or proposed to offer the memoirs of any other person who participated in arranging the sitting (if such accounts were even admissible); and they have not identified any contemporaneous records bearing on the dealings between Stern, Condé Nast, and Monroe in connection with these sittings.

The Lavenders argue that Stern's narrative itself sufficiently establishes that the Last Sitting photographs were created at Condé Nast's "instance and expense" as to be works for hire under the 1909 Act. Stern's narrative, they argue, rebuts the presumption of copyright ownership arising from the registrations of those photographs. And because there is no other surviving evidence as to the circumstances of the sittings, the Lavenders argue, Stern's narrative establishes that the photographs were "work for hire" belonging to Condé Nast.

The Court takes a different view. In the Court's assessment, Stern's 1982 remembrance of *The Last Sitting* cannot bear the legal weight that the Lavenders place on it.

To be sure, one can extract aspects of Stern's narrative to support a work-for-hire theory. Such a theory would focus on Stern's account of the second and third sittings. These, Stern

wrote, were arranged at *Vogue*'s request and with *Vogue* picking up the tab for certain associated expenses. At the same time, numerous facts in Stern's narrative point towards the opposite result: that the Monroe photographs were *not* works for hire. As to the critical legal question of ownership, Stern's long-after remembrance is ultimately an equivocal and question-begging text. It is, in the end, far too elusive a source to determine the legal rights to an iconic photographic trove.

The facts tending to make Stern the photographs' author include the following. As to the work-for-hire element of "instance," Stern states that the idea to photograph Monroe was his. *Vogue*'s role as to the first sitting with Monroe was decidedly secondary, with the magazine's interest emerging largely after the fact. And while *Vogue* was a greater impetus for the second and third sittings, having had the idea to shoot fashion images with Monroe clothed, it was Stern's idea, in the midst of those sittings, to shoot what proved the most iconic images from these sittings, including those of Monroe in a bedsheet and those depicting her from above. Further, Stern's essay repeatedly reveals that Stern retained creative control over the project. At times in collaboration with Monroe, he directed the lighting, the sets, and the poses for the bulk of the images. *Vogue* retained creative discretion as to a decision not bearing on copyright ownership: which among Stern's many photographs to publish in its pages.

As to the element of "expense," while *Vogue* covered various expenses for the Last Sitting, the terms of Stern's compensation are ambiguous. Stern's remembrance also leaves inconclusive who—as between Stern and *Vogue*—footed the bill for the cases of Dom Perignon and Chateau Lafitte-Rothschild. Stern depicts these libations as bought purposely to liberate his and Monroe's creative impulses in connection with the photo shoot, and as having influenced, among other things, Monroe's choices as to how to pose. Stern's narrative also recounts that, at

least with respect to the black and white images, it was in his darkroom that his assistant, Gar, developed those images.

Critical, too, is an issue which Stern's narrative does not address: whether there was an understanding at the time of the sittings between him and *Vogue* as to who would retain ownership of the copyrights to the works. Under the 1909 Act, as under the 1976 Act, an agreement as to ownership between a photographer and the entity that hired him could be dispositive as to copyright ownership. *See Urbont*, 831 F.3d at 85–86 ("Under the 1909 Copyright Act, an "employer" who hires another to create a copyrightable work is the "author" of the work for purposes of the statute, *absent an agreement to the contrary*.") (emphasis added) (internal quotation omitted); *Martha Graham Sch.*, 380 F.3d at 636 ("[U]nder both the 1909 and 1976 Acts, a person's status as an employee renders a work created within the scope of employment as a work for hire, as to which the copyright belongs to the employer (in the absence of a contract providing otherwise)."). Stern's narrative in *The Last Sitting* refers generally to the existence of a "contract" between him and Vogue. *See Last Sitting* at 17 ("*Vogue* had given me a contract to shoot one hundred fashion pages a year. And on top of that, I got ten pages to do whatever I wanted with—and enough expense money to produce them."). But it is silent as to the terms of that agreement.

That is understandable: As *The Last Sitting* makes clear, Stern intended his 1982 book as an affectionate memoir of a brush with a cinematic legend. Stern recounts with emotion his frisson with the iconic, arresting, and—as ensuing events soon proved—doomed Monroe. In preparing this account, Stern surely did not envision his memoir as a text from which a determination as to copyright ownership might decades later be made. Unsurprisingly, *The Last*

*Sitting* does not recite the terms of Stern's contract with Condé Nast. And discovery of Stern and Condé Nast has failed to locate that agreement.

Under these circumstances, assigning dispositive significance to Stern's narrative would accent an historical accident: that, today, 56 years after the events at issue, Stern's account alone survives. All other direct evidence bearing on copyright ownership has been lost to history. The percipient witnesses are all likely dead. And no contemporaneous records of what these persons intended about copyright ownership, or how the sittings came about, survive. The doctrine that gives presumptive weight to copyright registrations exists for such situations. In cases of ancient and hard-to-reconstruct events, the fact of copyright registration within five years of first publication supplies a rational default standard. *See generally* 3 Nimmer on Copyright § 12.11.

It rightly so functions here. Stern's hagiographic memoir of his encounters with a 20th century icon is insufficient to rebut the presumption in his favor as to the Last Sitting. And, until the Lavenders posited otherwise after being sued in this case, Stern's claims of ownership had gone publicly unchallenged for 36 years. To disturb that long-unchallenged claim based on a deconstruction of his memoir would indulge in unacceptable speculation as to arrangements between persons long gone. It would assign undue importance to a remembrance written for quite different purposes.

Deferring to the copyright registrations is particularly appropriate here. The course of dealing between Stern and Condé Nast as to these photographs since 1962 is squarely at odds with the Lavenders' thesis as to copyright ownership. These dealings reflect a common understanding that Stern owned the copyrights to these photographs. There were repeated grants of licenses to Condé Nast publications by Stern to publish photographs from the Last Sitting. And the 1982 agreement between Condé Nast and Stern explicitly identifies Stern as the

copyright owner.  *Cf. Ward v. Nat'l Geographic Soc'y*, 208 F. Supp. 2d 429, 440 (S.D.N.Y. 2002) (where "plaintiff ha[d] produced evidence showing that NGS repeatedly paid Mr. Ward for reusing his work," a "reasonable trier of fact might consider it strange that NGS would pay Mr. Ward to reuse works that it already owned").[17]  This course of dealing is powerful circumstantial evidence that Stern and Condé Nast at all times agreed and understood—even if the place, time, and textual expression of their agreement to this effect is today no longer recoverable—that Stern would retain the copyright interests in the photographs.[18]

---

[17] The 1982 Agreement does not state whether Stern was at all times the owner of the copyright to the photos or whether, sometime after the sittings, he became owner on account of a transfer of rights from Condé Nast.  The Court has no occasion to resolve that detail and nothing turns on it.  The Court does note, however, that a formal, written contract would not have been necessary to establish a post-creation transfer.  A valid transfer of copyright does not require a particular form of document, or the use of the word "copyright," where there is other clear evidence of the parties' intentions.  *See Papa's-June Music, Inc. v. McLean*, 921 F. Supp. 1154, 1158–59 (S.D.N.Y. 1996) ("Section 204(a) does not mandate a particular form of transfer document."); *see also, e.g.*, *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 413 (7th Cir. 1992) ("[A]lthough the agreement does not mention the word 'copyright,' its wording leaves little doubt that Bertel sold all the assets of Spotline Studios, tangible and intangible alike.").  The Second Circuit has acknowledged rulings by other circuits to the effect that the use of a legend on a check may satisfy the writing requirement for a transfer of copyright ownership.  *See Playboy Enterprises*, 53 F.3d at 564.  A court in this District has stated that, "the writing evidencing the transfer need not be lengthy or detailed."  *Rico Records Distributors, Inc. v. Ithier*, No. 04 CIV. 9782 (JSR), 2006 WL 846488, at *1 (S.D.N.Y. Mar. 30, 2006).

[18] For this reason, even if the Court had not held on summary judgment that Stern owned the copyright in the Last Sitting photographs, it would so find at the bench trial that will soon occur in this case.  The parties have represented that they have not uncovered any substantive evidence bearing on ownership beyond that presented on the summary judgment record.  Insofar as no issues of witness credibility bear on this issue, the Court can today assess the weight of the evidence.  The Court therefore alternatively holds that the weight of the evidence presented overwhelmingly demonstrates that Stern owned the copyright to the Last Sitting photographs.

### ii. Later correspondence with Condé Nast

The Lavenders also note correspondence from 1998, 2014, and in 2017 in which outside counsel for Condé Nast reserved the right to claim that the Last Sitting photographs were works for hire. Such secondhand commentary is inadmissible on the issue of ownership.

First, in 1998, after Stern's 1997 lawsuit was discontinued, Condé Nast's outside counsel wrote Stern's counsel. *See* MacGiollabhui Decl. Ex. F. Condé Nast's counsel stated that Condé Nast did not possess the contract to which Stern had referred in his 1982 memoir. But, Condé Nast's counsel stated, absent such a contract, it was possible, given Stern's narrative, that Condé Nast was the copyright owner. *See id.* Stern's counsel responded by asserting the opposite. *See id.* Ex. G. These letters are both inadmissible as to the legal propositions asserted therein as to who owned copyright.[19] Neither writer was a percipient witness to relevant events. Each merely asserted a legal position based on their review or understanding of other materials. To the extent each letter writer expressed an opinion as to copyright ownership, that ultimate conclusion is a legal question for the Court.

Second, in 2014, Condé Nast's representative emailed Stern's estate in response to its inquiry:

> As Bert Stern himself was aware, Condé Nast owns the copyright to works commissioned by Condé Nast magazines pursuant to contracts with Mr. Stern and the copyright law in effect at the time. (Rights to the Marilyn Monroe "Last Sitting" images were granted back to Mr. Stern subsequent to publication of those images.) Moving forward, as in the past, Condé Nast will not pay royalties to the Bert Stern Estate on revenues generated through the licensing and/or reproduction print sales of Condé Nast's copyrighted works. Additionally, any requests for licensing of the copyrighted material should be returned to Condé Nast.

---

[19] These letters *are* likely admissible as evidence of the parties' course of dealing, but they are ultimately of little probative value as to that point: Condé Nast continued to license rights to Last Sitting works from Stern during the period in which this correspondence took place, and as described in the text, the letters provide at best conflicting evidence of the parties' dealings.

Boughn Decl. Ex. 2

This email is also inadmissible.  Not only does it represent a legal conclusion by a non-participant writer, it is also internally contradictory or, at best, opaque.  On plaintiffs' reading, the email's second sentence states that the rights to the Last Sitting photographs at some point had been transferred to Stern.  But the previous sentence suggests the opposite, stating that Condé Nast "owns the copyright to works commissioned by Condé Nast magazines pursuant to contracts with Mr. Stern and the copyright law in effect at the time."

Finally, in 2017, Condé Nast reported to the Lavenders's counsel that while it lacked records or witnesses as to the events at issue, its position, based on Stern's memoir, was that "Condé Nast would be deemed to be the owners of the copyright therein."  *See* MacGiollabhui Decl., Exs. H & I.  This post-hoc legal opinion is similarly inadmissible.

The Court thus holds that the Lavenders cannot meet their burden to rebut the validity of the copyright registration for the Last Sitting photographs.  On the record in this litigation, Stern was—and his successors in interest are—the copyright owners as to these photographs.[20]  While other disputes of fact prevent resolving other elements of Stern's infringement claims on summary judgment, the Court can and does remove copyright ownership as an issue to be tried.

**B.      Infringement Issues With Respect to the Last Sitting Photographs**

A plaintiff, to establish infringement, must next establish unauthorized copying with respect to a property interest protected by the copyright laws.  *Boisson*, 273 F.3d at 267.  The cross-motions for summary judgment raise several issues implicating this element.

---

[20] This ruling as to ownership of the photographs binds only the parties to this lawsuit: plaintiffs and the Lavenders.  The Court does not express an opinion as to whether, in the event of a dispute over ownership between plaintiffs and non-party Condé Nast, Condé Nast's course of dealing and statements would estop it from claiming ownership.

### 1.   Applicable Legal Principles Governing Copyright Infringement

Under both the 1909 and 1976 Acts, a grant of copyright represents "a federal grant of a property interest in the production, replication, publication, and distribution of certain classes of 'original works of authorship fixed in any tangible medium of expression.'" *Davis v. Blige*, 505 F.3d 90, 98 (2d Cir. 2007) (quoting 17 U.S.C. § 102(a)). "Like other forms of property ownership, copyright ownership is a bundle of discrete rights regarding the owner's ability to use his property . . . each of which may be transferred and owned separately." *Id.* (internal quotation and citations omitted). These include the right to (1) reproduce the copyrighted work in copies; (2) prepare derivative works based on the copyrighted work; (3) distribute copies of the copyrighted work to the public by sale or transfer of ownership; (4) perform the copyrighted work publicly; and (5) display the copyrighted work publicly. 17 U.S.C. § 106 (1)-(5). A copyright owner may sue for infringement those who trench on any of these rights. *See Arista Records, LLC v. Doe 3*, 604 F.3d 110, 117 (2d Cir. 2010).

### 2.   Analysis

#### a.   Infringement Issues Raised on Summary Judgment

Plaintiffs allege the Lavenders infringed their copyright with respect both to unmodified and modified prints of Last Sitting photographs. As to the former, plaintiffs claim that the Lavenders made unauthorized copies of Last Sitting photographs, publicly displayed these copies, and offered for sale and sold those copies. As to the latter, plaintiffs claim that the Lavenders modified Last Sitting photographs, publicly displayed these in modified form, and offered for sale and sold these modified images. *See* Am. Compl. ¶¶ 25–35.

On summary judgment, plaintiffs recognize that the Lavenders have raised triable issues of fact as to whether Stern gifted certain prints to the Lavenders and authorized them, during his

lifetime, to make modified (bejeweled) prints. *See* Pl. Br. at 10–11, 16. Plaintiffs accordingly seek summary judgment only on two discrete infringement claims. First, they claim that the Lavenders' conduct in making and selling "posters" depicting the Modified Prints infringed their copyrights. Second, they claim that the Lavenders' display on eBay of images of works they claim to own was infringing.[21] The Court addresses these questions in turn.

### b. Creation of "Posters" of Modified Last Sitting Photographs

Plaintiffs claim that the Lavenders, by taking two-dimensional photographs of various Modified Prints after Stern's death and marketing them as "posters," infringed plaintiffs' right to reproduce the Last Sitting photographs.[22] As noted, in June 2015, the Lavenders entered into an agreement with OnGallery Ltd., licensing it to reproduce and sell two-dimensional reproductions of nine three-dimensional Modified Prints, which the parties refer to as "posters" and which were sold by OnGallery through Amazon.com, with the Lavenders receiving 40 percemt of the proceeds of the sales of these posters. *See* JSF ¶¶ 24–27 & Ex. 10.

This issue raises a question of the right to make derivative works, which all agree the Modified Prints are. Under the 1976 Act, the owner of an original work possesses the rights to make derivative works. 17 U.S.C. § 106(2); *see also id.* 103(b). "The aspects of a derivative work added by the derivative author are that author's property, but the element drawn from the pre-existing work remains on grant from the owner of the pre-existing work." *Stewart v. Abend*,

---

[21] As to infringement, the Lavenders appear to argue that their factual claim that Stern gifted them prints or authorized them to modify and sell copies of Last Sitting photographs should be resolved in their favor on summary judgment. That argument must be denied. These are quintessential disputes of fact that appear likely to turn on questions of credibility. Thus, although the Court serves as finder of fact in this case, it cannot resolve this dispute without the benefit live testimony at trial.

[22] The Court understands this form of infringement to form a part of plaintiffs' claims in Counts One and Two.

495 U.S. 207, 223 (1990). Therefore, unless the original work has passed into the public domain, and there is no such claim here, the re-use of a derivative work—including its reproduction and distribution—infringes the original copyright if the person "who employs the work does not have a valid license or assignment for use of the pre-existing work." *Id.*

This question thus turns on a central question of fact: whether the Lavenders were granted a license by Stern, and if so, whether such a license survived Stern's death. Because that factual question is in dispute, with evidence and inferences available to each side, summary judgment is unavailable.

Nor may the Court resolve this question as a matter of law, as plaintiffs argue. Plaintiffs' argument relies on *Stewart*. There, the Supreme Court addressed a circumstance not presented here: where a copyright holder has assigned his rights in the *renewal* term of his copyright to the owner of a derivative work, whether *that* assignment—of the renewal right—is ineffective (and a derivative work may be infringing) where the original copyright holder dies during the pendency of the initial copyright term, before the renewal term commences. The Court in *Stewart* held that such an assignment is ineffective because the "assignment of renewal rights by an author before the time for renewal arrives cannot defeat the right of the author's statutory successor to the renewal rights if the author dies before the right to renewal accrues," the "assignee of renewal rights takes only an expectancy." *Id.* at 215 (citing *Miller Music Corp. v. Charles N. Daniels, Inc.*, 362 U.S. 373 (1960)).

*Stewart*, however, has no bearing here. This case, as pled, does not implicate any renewal-term issues. *Stewart*'s central premise is that copyright law establishes "a system comprised of an original term and a completely separate renewal term," *id.* at 218, in which "the renewal right 'creates a new estate clear of all rights, interests or licenses granted under the

original copyright,'" *id.* (quoting *G. Ricordi & Co. v. Paramount Pictures, Inc.,* 189 F.2d 469, 471 (2d Cir. 1951)), and in which the owner of the renewal-term rights takes those rights unencumbered by any license granted by the original-term holder. *See also Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1968 (2014). But that principle has no bearing on the validity of a license during the term of the original copyright, as plaintiffs claim is in effect here.

The Court accordingly denies the parties' cross-motions for summary judgment as to the portion of plaintiffs' infringement claims that asserts that the making and selling of "posters" infringed their copyrights.

### c. Display of Works Incident to Offers for Sale on Websites

Plaintiffs also claim that the Lavenders infringed their copyright by posting on eBay and Amazon photographic images of prints (unmodified and modified) of Last Sitting photographs that they were offering for sale. *See* JSF ¶ 16. Plaintiffs seek summary judgment on the ground that each display of such an image was an act of infringement. The Lavenders counter that, as ostensible owners of the prints they sought to sell, they were permitted to display, incident to the sales process, photographs of items they were lawfully offering for sale. This was so, the Lavenders argue, under either the "first sale" doctrine or the doctrine of fair use.

In addressing plaintiffs' summary judgment motion on this point, the Court assumes *arguendo* that, as the Lavenders claim, they owned outright, pursuant to gifts from Stern, the photographs they were offering for sale.[23] On that assumption, the Lavenders had the right to

---

[23] Plaintiffs forcefully dispute this factual claim. They dispute that Stern gifted any prints to the Lavenders. That Stern during his lifetime retained profits of sales of Modified Prints, they argue, is inconsistent with the claim that the Modified Prints were ever gifted to the Lavenders. They also dispute that the writing(s) or asserted oral statements cited by the Lavenders effected such gifts. These factual disputes require resolution at trial.

sell the photographs they owned under the "first sale" doctrine.[24]  That doctrine allows a "purchaser of a physical copy of a copyrighted work [to] give or sell that copy to someone else without infringing the copyright owner's exclusive distribution rights."  *Pearson Educ., Inc. v. Liu*, 656 F. Supp. 2d 407, 408 (S.D.N.Y. 2009); 17 U.S.C. § 109(a) ("[T]he owner of a particular copy . . . lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy.").

The first sale right, however, protects the purchaser only against a claim that the sale itself violated the copyright owner's distribution right.  *See Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640, 655 (S.D.N.Y. 2013) ("[T]he first sale defense is, by its own terms, limited to assertions of the distribution right.").[25]  It does not insulate the purchaser from liability for violating other copyright interests of the copyright owner.  *See Capitol Records*, 934 F. Supp. 2d at 655 ("[T]he first sale defense is limited to material items, like records, that the copyright owner put into the stream of commerce.").  The "first sale" doctrine does not address the separate issue of the means used to market the item for sale, here the reproduction of an image of Stern's copyrighted work alongside the Lavenders' offer on eBay and Amazon to sell it.

The Lavenders' practice of uploading, on websites such as eBay, images of copyrighted objects they were offering to sell instead presents an issue of fair use.  The fair use doctrine

_____

[24] The Court notes that, even on plaintiffs' account of the facts, there is no contention that Stern conferred on the Lavenders the entire suite of interests inuring in the Last Sitting photographs.

[25] The premise of the "first sale" doctrine is that, by selling a copy of the work, the original copyright owner has "exhausted" his distribution right as to that item, *Palmer/Kane LLC v. Gareth Stevens Publ'g*, No. 15-CV-7404 (GHW), 2017 WL 3973957, at *17 (S.D.N.Y. Sept. 7, 2017), and "received his reward" for that use of the work, *Platt & Munk Co. v. Republic Graphics, Inc*., 315 F.2d 847, 854 (2d Cir. 1963) (internal quotations omitted).

supplies an affirmative defense to a copyright infringement claim. *See* 17 U.S.C. § 107. "Although fair use is a mixed question of law and fact," courts can make fair use determinations at the summary judgment stage where there are no genuine issues of material fact or where, as here, the material facts are assumed *arguendo*. *See, e.g.*, *Cariou v. Prince*, 714 F.3d 694, 704 (2d Cir. 2013) (quoting *Blanch v. Koons*, 467 F.3d 244, 250 (2d Cir. 2006)).

As the Second Circuit has explained, although § 107 enumerates particular uses as "fair"—including criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, [and] research"—the fair use doctrine covers uses other than these specified activities, *id.* at 705–06. "[A] secondary work may constitute a fair use even if it serves some purpose other than those (criticism, comment, news reporting, teaching, scholarship, and research) identified in the preamble to the statute." *Id.* Further, the fair use doctrine does not require "that a work comment on the original or its author." *Id.* at 706. What is required is that, "a new work . . . alter the original with 'new expression, meaning, or message.'" *Id.* (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)). In assessing whether the challenged use had such a transformative nature, the focus is on how the work may "reasonably be perceived." *Id.* at 707 (quoting *Campbell*, 510 U.S. at 582).

The party asserting a fair use claim bears the burden of proving it. *Oyewole v. Ora*, 291 F. Supp. 3d 422, 433 (S.D.N.Y. 2018). In assessing a claim of fair use, the Court conducts a case-by-case analysis weighing various factors "in light of the purposes of copyright." *Fox News Network, LLC v. Tveyes, Inc.*, 883 F.3d 169, 176 (2d Cir. 2018). The relevant factors are: (a) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (b) the nature of the copyrighted work; (c) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (d) the

effect of the use upon the potential market for or value of the copyrighted work. *Id.* at 176–79; 17 U.S.C. § 107.

The issue here is whether it is fair use to display an image of a copyrighted work incident to an offer of it for sale on a commercial website. That issue was resolved thoughtfully by a district court in California three years ago in a case, *Rosen v. eBay, Inc.*, also involving sales on eBay. *See* No. CV 13-6801 MWF EX, 2015 WL 1600081, at *14 (C.D. Cal. Jan. 16, 2015). The plaintiff claimed that eBay infringed copyright by posting "a picture of a physical copyrighted object" on the site for sale; eBay defended on grounds of fair use. The court found fair use. The Court finds the reasoning in *Rosen* persuasive and draws on it in applying the fair use factors here.

As to the first factor, the purpose and character of the use, the "primary inquiry is whether the new use 'communicates something new and different from the original or otherwise expands its utility.'" *Fox News Network*, 883 F.3d at 176 (quoting *Authors Guild v. Google, Inc.*, 804 F.3d 202, 214 (2d Cir. 2015) (alterations omitted)). The central question is whether the new use is "transformative." *Id.*

The Lavenders' aim in displaying online a photograph of the works for sale was surely commercial, but, as the *Rosen* court recognized, such a *use* of the images is transformative: it is "to provide information to legitimate purchasers under the first sale doctrine, not for the artistic purpose of [the creator's] original images." *Rosen,* 2015 WL 1600081, at *15. A "use of the copyrighted works [in this way] is not exploitative in the traditional sense." *Id.* Rather, "the purpose of the reproductions [is] completely different from the purpose of the originals, and so they [are] transformative." *See id.* at *16–17 (while the "original photographs were created for an aesthetic and artistic purpose," eBay's postings "were created for the purpose of providing

information as to the condition and content of the magazines in which Rosen's photographs appeared"). Other courts have recognized that the use of copyrighted works for informational or identification purpose qualifies as transformative. *Cf. Authors Guild*, 804 F.3d at 217 ("Google's making of a digital copy of Plaintiffs' books for the purpose of enabling a search for identification of books containing a term of interest to the searcher involves a highly transformative purpose."); *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 102–03 (2d Cir. 2010) (recognizing, under trademark law, that a "defendant may lawfully use a plaintiff's trademark where doing so is necessary to describe the plaintiff's product and does not imply a false affiliation or endorsement by the plaintiff of the defendant"); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007) ("Although an image may have been created originally to serve an entertainment, aesthetic, or informative function, a search engine transforms the image into a pointer directing a user to a source of information."). This factor thus favors a finding of fair use.

The Court next considers the "nature of the copyrighted work." *Fox News Network*, 883 F.3d at 178. Where, as here, the work is creative and published, this factor weighs against a finding of fair use. But that factor is not dispositive when "the creative work of art is being used for a transformative purpose." *Cariou*, 714 F.3d at 710; *see id.* at 708 ("The more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use."); *see also Rosen*, 2015 WL 1600081, at *18 ("Because the work falls within the core of intended copyright protection, but [the creator] has previously authorized publication of this work, the factor therefore weighs only slightly against a finding of fair use."). This factor thus weighs—slightly—against a finding of fair use.

The Court next considers the "amount and substantiality of the portion used in relation to the copyrighted work as a whole," specifically, "the proportion of the original work used." *Cariou*, 714 F.3d at 710. The works displayed by the Lavenders are each either a direct copy of a Stern photograph or, in the case of a Modified Print, are based almost entirely upon an original photograph by Stern of Monroe (atop which jewels are layered).[26] The allegedly infringing images of these works posted on eBay, therefore, reproduce all or effectively all of the copyrighted Stern work. *See* Am. Compl. Ex. A. To be sure, "the copying of an entire work" does not *favor* fair use. *See Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 613 (2d Cir. 2006). But "such copying does not necessarily weigh against fair use" where "copying the entirety of a work is . . . necessary to make a fair use of the image." *Id.* Here, there was good reason to display the entire work on eBay incident to the sales process, so as to fully inform potential buyers as to the item for sale. *See Rosen*, 2015 WL 1600081, at *18–19; *cf. Perfect 10, Inc.*, 508 F.3d at 1165 ("The fact that Google incorporates the entire Perfect 10 image into the search engine results does not diminish the transformative nature of Google's use."). A buyer cannot be expected to purchase a work of art having seen only a snippet of it. Like the *Rosen* court, this Court finds that this factor, applied in the online-sales context, provides relatively limited guidance in the fair use equation.

Finally, the Court considers the "effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. This is "undoubtedly the single most important factor of fair use." *Fox News Network*, 883 F.3d at 179 (quotations omitted). The operative question is "whether the secondary use *usurps* the market of the original work." *Cariou*, 714

---

[26] *See, e.g.*, Lynette Lavender Dep. at 217–18 (describing process of modifying a print by attaching pearls on top).

F.3d at 708. Such can occur when "the infringer's target audience and the nature of the infringing content is the same as the original." *Id.* at 709. Here, as the *Rosen* court reasoned, the effect on the market of reproducing an image of the copyrighted work on eBay is "minimal" because "the use of the images by eBay and its users are transformative and are not commercially exploitative, and they do not substitute for paying for legitimate copies." *Rosen*, 2015 WL 1600081, at *19. Put simply, a reasonable buyer of an original Stern photograph—or a Stern Modified Print—would not be satisfied with a thumbnail image as contained on an Internet webpage. One product is a work of art, the other is a miniature reproduction used exclusively to facilitate the sale of the former. This factor thus strongly favors a finding of fair use.

Considering the fair use factors in totality, the Court finds that, as in *Rosen*, the display of images online for the purpose of facilitating a legitimate sale of an object owned by the seller qualifies as fair use. This reproduction in no way "displac[es] the need for the original work," but instead serves the finite purpose of facilitating a discrete sale. *Id.* The displayed images serve a "fundamentally different purpose and promote the development of a robust legal secondary market." *Id.* As such, the reproduction is consistent with the purpose of copyright law.

Accordingly, assuming that the Lavenders' lawful ownership of the copyrighted items offered for sale is established at trial, it will have been fair use for the Lavenders to photographically display on sites such as eBay the items offered for sale.

### C.     Defendants' Counterclaim Based on Plaintiffs' "Take-Down" Notices to eBay

Plaintiffs move for summary judgment on the Lavenders' remaining counterclaim. It alleges, under 17 U.S.C. § 512(f),  that plaintiffs, through counsel, in sending "takedown" notices to eBay, knowingly and materially misrepresented, in bad faith, to eBay that the

Lavenders' posting of works for sale on eBay was infringing a Stern copyright, when plaintiffs knew it was not.

The facts underlying this claim are largely undisputed, as they are drawn from correspondence. On February 7, 2017, plaintiffs' counsel, representing the Bert Stern Trust, submitted takedown notices of infringement to eBay, pursuant to the DMCA, Pub. L. 105-304, § 202, Oct. 28, 1998, 112 Stat. 2860 (codified at 17 U.S.C. § 512(c)). Counsel claimed that several listings the Lavenders had posted, which offered to sell original or Modified Prints, infringed Stern's 2013-registered copyright. *See* JSF ¶ 28 & Ex. 12. Counsel's notices initially designated eBay's "reason code 4.2" as the basis for asserting infringement. That code connotes that the "[l]isting contains [an] unlawful copy of [a] copyrighted image." *See* JSF Exs. 12A & 13.

An email exchange with eBay followed. Explaining the reason-code designation, plaintiffs' counsel stated: "The items are a limited edition print of a copyrighted photograph and are works of visual art. The uploading and public display of these items on eBay constitutes copyright infringement without regard to whether the item is counterfeit or not. No one can photograph these items as that too would constitute copyright infringement." JSF Ex. 13B. An eBay official responded that the reason code was incorrect, and that if counsel's "concern [was] with the product being sold," the Trust needed to submit a revised notice with a reason code related to "copyright-item infringement." *Id*. Plaintiffs' counsel thereupon changed the designated reason code to code 6.1, a residual category for "other" types of infringement. JSF Exs. 13B & 14. Alongside that entry, on each notice, plaintiffs' counsel wrote, "copyright infringement: Unauthorized reproduction and public display of an item protected by copyright." *Id.* Ex. 14.

The Lavenders' counterclaim here is under § 512(f), which makes liable a person who "knowingly materially misrepresents" to a service provider "that material or activity is infringing." 17 U.S.C. § 512(f). Relevant here, it is a complete defense to a claim under § 512(f) that the party issuing a takedown notice had a subjective good faith belief that the use in question was "not authorized." *Hosseinzadeh v. Klein*, 276 F. Supp. 3d 34, 44 (S.D.N.Y. 2017). ("A copyright holder is not liable for misrepresentation under the DMCA if they subjectively believe the identified material infringes their copyright, even if that belief is ultimately mistaken.") (citing *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1153 (9th Cir. 2015)).

The evidence here uniformly supports plaintiffs' defense of good faith. And critically here, the Lavenders have not supplied a factual basis on which to find the opposite: that plaintiffs, in pursuing takedown notices, made a knowing material misrepresentation. Plaintiffs' claim of copyright infringement in connection with the Lavenders' offer to sell Last Sitting photographs and Modified Prints was clearly colorable. It tracks the infringement claims that will proceed to trial in this lawsuit. And while the facts as to whether the late Stern had given away certain items and authorized certain posthumous actions are disputed, the Trust had sound reason to conclude that he had not done so and that the Lavenders do not own the objects they were offering for sale. If so, the Lavenders' display of photographs of those objects incident to the offer of them of sale would necessarily violate plaintiffs' copyright (as those displays would no longer be fair use because they would not be in service of lawful sales). For the Trust to assert this position did not evince bad faith or entail the making of a material misrepresentation. Further, as to the "reason code" that plaintiffs' counsel came to use, counsel's written exchange with eBay reflects that counsel accurately recited plaintiffs' theory of infringement to eBay, and then relied on eBay's instructions as to the code to use.

The Court therefore enters summary judgment for plaintiffs on the Lavenders' counterclaim. *See, e.g.*, *UMG Recordings, Inc. v. Augusto*, 558 F. Supp. 2d 1055, 1065 (C.D. Cal. 2008), *aff'd*, 628 F.3d 1175 (9th Cir. 2011).

### D.      Plaintiffs' Lanham Act claim

The Lavenders pursue summary judgment on the fourth count in the Amended Complaint, which claims a violation of the Lanham Act, 15 U.S.C. § 1125.  It alleges that the Lavenders, in marketing prints to customers, falsely and misleadingly represented that "prints sold by them are authentic Stern prints, that they bear his original signature, are accompanied by a genuine certificate of authenticity bearing his actual signature and they are authorized to sell them on eBay."  Am. Compl. ¶ 41.  It alleges that these misrepresentations are "likely to cause confusion or mistake as to the origin, sponsorship or approval of the Lavenders' goods and commercial activities."  *Id.*

The Lanham Act claim is focused on the "certificates of authenticity" that the Lavenders issued with the prints they sold.  *See* JSF ¶ 20.  Each stated that the work was an "Original Limited Edition Fine Art Print" that had been "signed personally by the artist."  *Id.*; *see also* JSF Exs. 5 & 6 ("Certificate of Authenticity").  Plaintiffs claim that these statements were misleading for multiple reasons, including because, they claim, Stern did not himself sign the certificates or authorize the posthumous sale of these works.  Pl. Reply Br. at 16–17.

The Court denies this motion.  As with the parties' dispute about infringement, this claim turns on disputes of fact that a finder could resolve in either side's favor.

On the one hand, a finder of fact could credit the Lavenders' testimony.  Lynette Lavender attested that Stern signed the certificates of authenticity "whenever he was in the mood" and that the Lavenders "would print [copies of the photographs] and he would sign

them." Lynette Lavender Dep. at 185. Stern did so, she testified, out of concern about "forgeries and fake prints." *Id.*; *see also id.* at 186 ("[P]eople started asking for some type of authenticity. So we got into the habit of doing so. It wasn't planned, just, it was a courtesy."). Further supporting the Lavenders, a finder of fact might find authentic and probative the document dated June 16, 2013 bearing Stern's apparent signature, which purported to give Lisa Lavender permission to sign Stern's photographs on his behalf, and to sell them. *See* Second Freeman Decl., Ex. J.

On the other hand, a finder of fact could disbelieve the Lavenders' testimony altogether. And as to the document dated June 16, 2013 the finder could find that Stern's signature was falsified or the product of the Lavenders' undue influence over a dying man. A finder of fact could also find that the document was not meant to have posthumous effect, but was only to cover the period when Stern was too ill to sign or sell prints himself. A finder might note, too, the testimony of Lynette Lavender that Lisa Lavender sometimes retroactively signed prints, *see* Lynette Lavender Dep. at 186–87, a practice that the June 16, 2013 writing does not explicitly countenance.

The Court denies the Lavenders' motion for summary judgment on plaintiffs' Lanham Act claim.

### E.       Plaintiffs' Claim for Deprivation of Property

Finally, the Lavenders seek summary judgment as to plaintiffs' fifth count, which alleges deprivation of property under New York law. *See* Am. Comp. ¶¶ 45–50. Plaintiffs allege that Stern, during his lifetime, entrusted to the Lavenders possession of electronic copies of images of prints, to use in the course of their work as his assistants, including in connection with their responsibility for shipping works to purchasers or to galleries authorized to sell Stern's works.

*Id.* ¶ 46. Plaintiffs also challenge the Lavenders' claim to own all existing Modified Prints, including those prints found in Stern's former home in Sag Harbor. *See* Pl. Response 56.1 ¶ 51. Plaintiffs contend that the Lavenders have retained electronic images and the Modified Prints, and have used them to make what plaintiffs claim are unauthorized sales on eBay. Am. Compl. ¶¶ 47–48. Plaintiffs seek to recoup this material, asserting that it does not belong to the Lavenders, but instead to the Trust and/or to BSP. *Id.* ¶ 49.

In moving for summary judgment, the Lavenders make two principal arguments. First, they argue, to the extent plaintiffs have cast their claim of improper retention of Stern's property as a breach of contract, they have not adduced a written contract resolving, as between Stern and the Lavenders, the posthumous possessory rights to these materials. *See* Def. Br. at 18. But plaintiffs did not allege the existence of a written agreement. Instead, they relied on the law of agency. They posited that, during Stern's lifetime, the Lavenders were his agents, and thus duty bound to safeguard his property and return it to his heirs or BSP absent authorization to keep it. Although the absence of a written agreement may bear on who had the right to retain the prints and electronic records that the Lavenders possess, it is ultimately a question of fact whether the Lavenders were entitled, on the basis of an asserted oral agreement with Stern or otherwise, to retain electronic copies of his prints and other items after Stern died. There is sufficient evidence, including circumstantial, on which plaintiffs can contend that the Lavenders never obtained any such posthumous rights at all, including to keep prints or electronic images thereof.

Second, the Lavenders argue that this claim was brought outside the three-year statute of limitations for claims of conversion. Def. Br. at 17. The Court reserves judgment on this argument, which has been thinly briefed. The Court notes that Stern's will was not accepted for probate until 2016, *see* JSF ¶ 5, that letters testamentary were not issued until March 3, 2016, for

Laumeister Stern, Bert Stern's widow and the trustee of the Bert Stern 2010 Trust, to which Stern's assets passed under his will, *see id.* ¶¶ 4–5, and that this lawsuit was initiated nine months later, on December 22, 2016, *see* Dkt. 1. These facts may cast doubt on the Lavenders' claim that this claim was untimely brought.

The Court accordingly denies the Lavenders' motion for summary judgment on this claim.[27]

## CONCLUSION

For the reasons given above, the Court denies the parties' cross-motions for summary judgment, with one limited exception: the Court grants summary judgment for plaintiffs on the

_____

[27] In briefing this and other claims, the parties have disputed whether the Lavenders' testimony about oral conversations with Stern—in which he purportedly gave them permission after his death to possess, own, and/or sell his prints—is inadmissible under New York's Dead Man's statute. *See* N.Y. C.P.L.R. 4519 (McKinney). That statute excludes testimony that concerns a personal transaction or communication with a deceased person, so as "to protect the estate of the deceased from claims of the living who, through their own perjury, could make factual assertions which the decedent could not refute in court." *In re Estate of Nealon*, 962 N.Y.S.2d 481, 484 (N.Y. App. Div. 2013), *aff'd*, 22 N.Y.3d 1045 (2014) (internal quotations omitted). A federal court sitting in diversity is obliged to enforce that statute. *See Clark v. Meyer*, 188 F. Supp. 2d 416, 420–21 (S.D.N.Y. 2002) ("Federal rule 56(e) requires exclusion of evidence on summary judgment motions which the dead man's statute would exclude at trial."); Fed. R. Evid. 601. *See generally Rosenfeld v. Basquiat*, 78 F.3d 84, 88 (2d Cir. 1996). The Lavenders contend, however, that plaintiff Laumeister Stern has waived this protection through her testimony. *See id.*; *see also Martin v. Hillen*, 142 N.Y. 140, 144 (1894) ("The testimony, if it involves a personal transaction or communication with the deceased, must be confined strictly to the same transaction or communication to which the executor or administrator has already testified in his own behalf."). The Court will reserve judgment as to the admissibility of such testimony, and will invite pretrial motions *in limine* directed to this issue. (The Court notes, too, that the application of the statute at summary judgment is a question that has divided the judges of this District. *See Lewin v. Richard Avedon Found.*, No. 11-CV-8767 (KMW) (FM), 2015 WL 3948824, at *10 (S.D.N.Y. June 26, 2015)). The Lavenders further claim that the Dead Man's statute excludes evidence only as to state-law claims, and not the copyright or Lanham Act claims here. As to the claims litigated on summary judgment which the Court has not dismissed, the Court is persuaded that there is sufficient evidence on which a trier of fact could rule either way on plaintiffs' open claims.

Lavenders' second counterclaim, alleging a violation of 17 U.S.C. § 512(f). The Court has also resolved, in the course of this decision, certain underlying issues that, while not resulting in a grant of summary judgment on any claim, affect the scope of issues to be tried. These include the issue of ownership of copyright to the Last Sitting photographs and the Lavenders' right, under the doctrine of fair use, to use images of works—assuming they own such works—to market those works for sale on the Internet.

This case will now proceed to trial. A separate order will issue shortly setting deadlines for the parties' joint pretrial order and related pretrial submissions.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: July 20, 2018
New York, New York